ajg

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,     )
                                       )
                 Plaintiff,     )
                                       )
v.                                 )          Case No. 06-40074-JAR
                                       )
JORGE LUIS OLIVARES-CAMPOS,     )
                                       )
               Defendant,     )
_____)

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Jorge Luis Olivares-Campos' Motion to Suppress Evidence (Doc. 7).  The parties have fully briefed the motion and the Court held an evidentiary hearing on July 13, 2006.  The Court has thoroughly considered the parties' briefs, the evidence, and the oral argument, and is prepared to rule.  For the reasons stated below, defendant's motion is denied.

## I.  FACTUAL BACKGROUND

On April 3, 2005, at approximately 8:45 a.m., defendant was filling his green Toyota pick-up truck with gas at Kelly's Express, a filling station in Topeka, Kansas near an exit from Interstate 70.  As he was filling, Shawnee County Sheriff's Deputy Brian Rhodd arrived at the gas station.  Deputy Rhodd, who was on a patrol shift, parked his patrol car in the front stall outside of the Kelly's Express.  Deputy Rhodd noticed defendant out of the corner of his eye and then looked away quickly.  As Deputy Rhodd observed defendant through his mirror, he noticed defendant stealing glances at him, and also noticed that the Toyota had a California license plate.

1

Deputy Rhodd approached defendant and introduced himself.  He asked defendant if he could speak with him, and defendant agreed.  Defendant identified himself as Jorge Luis Olivares-Campos.  Deputy Rhodd noticed defendant was nervous.  Defendant's hands were shaking and his heart beat was visible through his shirt.  Deputy Rhodd asked defendant about his travel plans, and why he was so nervous.  Defendant initially told Deputy Rhodd that he was traveling from Visalia, California to Kansas City to live and work.  As to being nervous, defendant stated he had been driving all night, and was just tired.  Defendant then told Deputy Rhodd that he "may" be moving to Kansas City, and added that he works on golf courses. Defendant told Deputy Rhodd that he did not know where he was going to live in Kansas City, and that he had to call someone when he arrived.  Deputy Rhodd noticed that extension cords were the only thing in the bed of the pick-up, that defendant was traveling with only one bag, that the interior of the Toyota was littered with bottles and wrappers, and that a religious picture was affixed next to the odometer.

Defendant told Deputy Rhodd he did not own the Toyota pick-up, and that he only knew the owner by his first name, Francisco.  Defendant offered the vehicle registration to Deputy Rhodd, which showed the pick-up was owned by Francisco Rosales.  Deputy Rhodd then asked defendant for identification.  Defendant gave Deputy Rhodd a driver's license from Washington State.

As defendant went to pay for the gas, Deputy Rhodd took the vehicle registration and defendant's driver's license to the patrol car.  Deputy Rhodd called in defendant's license and discovered it was expired, but that defendant had no criminal history record.  Deputy Rhodd

2

contacted dispatch and requested assistance from Deputy Tracey Trammel, a canine handler. Deputy Rhodd then pulled his police car up next to defendant's pick-up, which was still in the gas stall.

When defendant returned from paying for his gas, Deputy Rhodd returned his driver's license. Deputy Rhodd asked defendant if there were any drugs in the vehicle, specifically any marijuana, cocaine, heroin, or methamphetamine. Defendant denied each substance, but when asked about methamphetamine, he looked down and away when answering "no."

Deputy Rhodd then asked defendant for consent to search the vehicle and defendant said, "OK." Deputy Rhodd then asked defendant whether he was more comfortable reading Spanish or English. Defendant said he was more comfortable with Spanish, and Deputy Rhodd provided defendant a consent to search form that was written in both Spanish and English. The defendant signed the consent form written in Spanish, stating that he understood it.

Soon after, Deputy Trammel arrived with the drug detection dog. When Deputy Trammel ran the dog around the Toyota pick-up, the dog did not "hit." Deputy Trammel reported to Deputy Rhodd that there was no indication from the dog that the truck contained drugs. Because Deputy Rhodd was still suspicious that there were drugs in the vehicle, he asked defendant to move the vehicle away from the gas pump area for the search. After agreeing and pulling the truck over to the side, defendant went to a grassy area towards the end of the driveway, standing about fifteen to twenty feet away. Defendant stood in this area for the entirety of the search. Although the video of the stop has no audio on this portion, it does not appear that defendant attempted to speak to the deputies or intervene in the search.

Deputy Rhodd began searching the interior of the truck while Deputy Trammel searched

underneath the bed.  Deputy Trammel noticed that the belly of the truck contained a heavy layer

of undercoating, and had shiny new bolts which appeared to have been recently tooled.  He also

noticed an apparent depth discrepancy in the bed of the truck.  Believing a false compartment

existed underneath the truck bed, Deputy Trammel used a small drill bit to drill a hole into the

bed of the truck.  Then using a small probe, Deputy Trammel discovered a depth discrepancy of

about three inches, and that the cavity contained something movable.  Deputy Trammel also

observed cellophane through the hole.

      The deputies asked defendant to follow them approximately seven miles to downtown

Topeka, where the law enforcement headquarters is located.  There, the bed-liner of the truck

was removed, revealing a hidden compartment which contained fourteen packages of

methamphetamine.  The packages were contained in clear plastic boxes which had been

smothered in axle grease and wrapped in cellophane.  The area around the hidden compartment

had been sprinkled with Cayenne pepper.  Defendant was arrested, and provided inculpatory

statements after receiving *Miranda* warnings.

## II. DISCUSSION

      Defendant asks this Court to suppress the drugs and statements obtained by police as the

fruits of an illegal search of defendant's Toyota pick-up.  Defendant argues the following: (1)

Deputy Rhodd did not have a reasonable suspicion to justify stopping the defendant; (2)

defendant did not  voluntarily consent to the search; (3) under the totality of the circumstances,

the deputies did not have reasonable suspicion to believe defendant was in possession of

contraband, or that his vehicle contained evidence of a crime; (4) even if consent was voluntary,

the deputies exceeded the scope of the consent to search by continuing to search after the drug-

4

sniffing dog did not alert to the car; (5) the deputies exceeded the scope of the consent to search

by asking the defendant to move his vehicle away from the gas pumps; (6) the deputies exceeded

the scope of the consent to search by drilling a hole in the truck; and (7) the deputies seized the

defendant without reasonable suspicion when they asked him to drive the truck to police

headquarters.

### A.  Voluntariness of the Encounter

"In determining whether a seizure comports with the Fourth Amendment, courts have

identified three categories of police-citizen encounters: '(1) consensual encounters which do not

implicate the Fourth Amendment . . . (2) investigative detentions which are Fourth Amendment

seizures of limited scope and duration and must be supported by a reasonable suspicion of

criminal activity . . . and (3) arrests, the most intrusive of Fourth Amendment seizures and

reasonable only if supported by probable cause.'"[1]

"Obviously, not all personal intercourse between policemen and citizens involves

'seizures' of persons."[2]  "[A] seizure does not occur simply because a police officer approaches

an individual and asks a few questions."[3]  A consensual encounter becomes a stop when, "taking

into account all of the circumstances surrounding the encounter, the police conduct would 'have

communicated to a reasonable person that he was not at liberty to ignore the police presence and

go about his business.'"[4]  But "as long as a reasonable person, as opposed to a person knowingly

---

[1]*U.S. v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) (quoting *United States v. Davis*, 94 F.3d 1465, 1467-68 (10th Cir. 1996) (citations omitted)).

[2]*United States v. Ringold*, 335 F.3d 1168, 1173 (10th Cir. 2003) (citing *Florida v. Bostick*, 501 U.S. 429, 439 (1991)).

[3]*United States v. Laboy*, 979 F.2d 795, 798 (10th Cir. 1992) (citing *Bostick*, 501 U.S. at 434).

[4]*Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

carrying contraband, would feel free to leave," encounters between police and citizens are consensual, and "need not be supported by reasonable suspicion of criminal activity."[5]

The Tenth Circuit has identified the following factors as relevant to determining the validity of a consensual encounter under the totality of the circumstances:

> [T]he threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.[6]

In *United States v. Ringold*,[7] police officers approached two men after they had stopped at a filling station. The interaction took place "in full view of other patrons," and the police showed no sign that the car's occupants were not free to leave; they did not touch the occupants, brandish weapons, or use threatening tones of voice or gestures. Furthermore, "the patrol car was not blocking defendants or their car from leaving the station."[8] The Court found the encounter was a consensual one.[9]

Similarly, Deputy Rhodd initially approached defendant after he had already stopped at a filling station. Deputy Rhodd asked him simple questions about his travel plans and demeanor. Although defendant did not attempt to leave, nothing indicates he was not free to do so. Deputy

---

[5]*Laboy*, 979 F.2d at 798.

[6]*Ringold*, 335 F.3d at 1172 (citing *United States v. Hill*, 199 F.3d 1143, 1147-48 (10th Cir. 1999)).

[7]*Id.*

[8]*Id.*

[9]*Id.* at 1173.

Rhodd's police car did not block defendant from leaving.  Defendant voluntarily answered Deputy Rhodd's questions.  Thus, the initial interaction between Deputy Rhodd and defendant was a consensual encounter, and need not be supported by any articulable suspicion.  Police may also "ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures."[10]  As noted above, prolonged detention of a person's identification is a factor that, under the totality of the circumstances, can signal to an objective person that they are not free to leave.  As the government points out, "notifying a motorist that []he is free to depart is not an essential element of a consensual encounter."[11]  However, "it may nonetheless be a significant factor towards finding the encounter was free from constraint."[12]  Furthermore, "'accusatory, persistent and intrusive questioning' can turn a voluntary encounter into a coercive one."[13]

After giving Deputy Rhodd his driver's license, defendant went inside the station to pay for gas.  When defendant returned, Deputy Rhodd's patrol car was parked next to his truck at the filling pump.  Deputy Rhodd gave back defendant's driver's license, but did not tell him he was free to go.  Instead, he began questioning defendant about illegal drugs.  Nevertheless, the Court still views the encounter as a consensual one.  The interaction took place during the day, in public, and in the full view of other patrons.  Deputy Rhodd never touched defendant or drew his weapon.  Deputy Rhodd's car did not block defendant in at the gas pump.  While asking about

---

[10]*United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004) (citing *Florida v. Bostick*, 501 U.S. 429, 434-435 (1991)).

[11]*United States v. Robinson*, No. 99-10018-01, 1999 WL 358742, at *3 (D. Kan. May 12, 1999).

[12]*Id.*

[13]*United States v. Edwards*, No. 04-20002-01-KHV, 2004 WL 1534173, at *9 (D. Kan. June 21, 2004) (quoting *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995)).

drugs, Deputy Rhodd's voice remained unthreatening.  The Court finds that an objectively

reasonable person in these circumstances would have felt free to ignore Deputy Rhodd's

questions and go about his business.

At the evidentiary hearing, defendant urged the Court to consider a broader view of the

Fourth Amendment's guarantee against unreasonable searches and seizures.  As the Tenth

Circuit has noted,

> It might be contended that all of this is unduly formalistic and does not give
> sufficient play to the natural tendency of any person—the wholly innocent
> individual as well as someone transporting contraband—to feel somewhat cowed
> when a law enforcement officer approaches and begins to ask questions,
> particularly those probing into the possibility of illegal activity.  But even apart
> from the difficulties that a more restrictive approach would pose for entirely
> legitimate law enforcement efforts, it is too late in the day—the law is too firmly
> established—to convert that notion into a more demanding test for the legality of
> a noncustodial encounter with an officer.[14]

However, even if the interaction between Deputy Rhodd and defendant rose to the level

of an investigatory stop when defendant returned from paying for gas, Deputy Rhodd's actions

were justified by reasonable suspicion that criminal activity was afoot.  Reasonable suspicion is

based on an "articulable suspicion that a person has committed or is about to commit a crime."[15]

"[R]easonable suspicion of criminal activity warrants a temporary seizure for the purpose of

questioning limited to the purpose of the stop."[16]

The government has articulated numerous reasons for Deputy Rhodd's reasonable

suspicion that defendant was engaged in trafficking contraband.  Defendant exhibited signs of

---

[14]*Ringold*, 335 F.3d at 1174.

[15]*Florida v. Royer*, 460 U.S. 491, 498 (1983).

[16]*Id.*

extreme nervousness.  Defendant had driven through the night from a drug source to a drug destination area.  Defendant did not own the car he was driving, and only knew the owner by his first name.  He had an expired driver's license and was carrying an amount of luggage seemingly inconsistent with the length of his trip.  Defendant did not know where he would stay in Kansas City, and was going to call someone when he got there.  Defendant gave inconsistent answers about his reasons for the trip.  And finally, there were numerous empty bottles and food wrappers in the interior of defendant's vehicle, and he had a religious picture on the dash.  As Deputy Rhodd testified at the evidentiary hearing, these are all common characteristics of a drug "mule," based on his training and experience in drug interdiction.[17]

The Court finds that this encounter was entirely consensual and does not implicate the Fourth Amendment.  Even if the facts gave rise to a finding that this was an investigatory detention, Deputy Rhodd developed reasonable suspicion that defendant was trafficking contraband, and could temporarily detain him for related questioning.  Asking defendant whether the vehicle contained drugs, and whether defendant would consent to a search of his vehicle is clearly related to that purpose.[18]  Because neither the questioning nor searching of defendant exceeded the limited purpose of investigating whether defendant was trafficking contraband, defendant's Fourth Amendment rights were not violated before he consented to the search of his vehicle.

_____

[17]*Johnson*, 364 F.3d at 1189 (explaining that the court should "accord proper deference to the judgment of an experienced officer.").

[18]Defendant contends Deputy Rhodd only had a reasonable suspicion that defendant was driving on an expired license, and therefore his detention should have been limited in scope to investigating the expired license. Because Deputy Rhodd had reasonable suspicion defendant was trafficking contraband, as already discussed, this argument fails.

**B. Consent**

Before the search of defendant's vehicle began, Deputy Rhodd asked for and received defendant's consent. "It has long been established that an officer may conduct a warrantless search consistent with the Fourth Amendment if the challenging party has previously given his or her voluntary consent to that search."[19] "The question of whether consent to search was given voluntarily is one of fact based on the totality of the circumstances."[20] "The government . . . bears the burden of demonstrating that the defendant's consent was voluntary."[21]

In this case, the government has more than met its burden to show that defendant's consent was voluntary. Defendant first gave Deputy Rhodd verbal consent to search. To remove any doubt that defendant understood, Deputy Rhodd provided a consent to search form written in Spanish, the language with which defendant said he was more comfortable. The form made clear that defendant did not have to consent to the search, and that he did not have to sign the form. Moreover, the form stated that "no promises, threats, force, physical or mental coercion of any kind whatsoever ha[d] been used against [defendant] to get [him] to consent . . . or sign this form."[22] Defendant signed the consent form, and the Court finds that defendant's consent was voluntary and valid.

The fact that defendant may have been stopped for an investigatory detention when he signed the consent form has no bearing on the voluntariness of his consent. "Valid consent can

---

[19]*United States v. Rosborough*, 366 F.3d 1145, 1151-52 (10th Cir. 2004) (citing *United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir. 2003)).

[20]*United States v. Poke*, 81 Fed. App'x 712, 714 (10th Cir. 2003) (citing *United States v. Sanchez-Valderuten*, 11 F.3d 985, 989-90 (10th Cir. 1993)).

[21]*Id.* (citing *Ringold*, 335 F.3d at 1171).

[22]*See* Gov't Ex. 1.

10

be given by a person being legally detained."[23]  Thus, even if defendant had been detained, that detention was based on reasonable suspicion and was therefore legal and did not invalidate consent.

Defendant next contends that, even if the consent was valid, Deputies Rhodd and Trammel exceeded the scope of that consent.  Defendant contends that the deputies exceeded the scope of the consent to search when they asked defendant to move his car away from the gas pump, and when they drilled a hole into the bed of the truck.

The Tenth Circuit has held that, "[w]hen law enforcement officers rely upon consent to justify a warrantless search, the scope of the consent determines the permissible scope of the search."[24]  "Whether a search exceeds the scope and duration of consent is a question of fact . . . which turns on what a reasonable person would have understood to be the scope and duration of his consent under the circumstances."[25]  Moreover, "[w]here [an] officer has indicated his intent to search for drugs or contraband, a suspect's consent 'certainly implies that the officer could look wherever drugs might be hidden.'"[26]  "A reasonable person would expect more than a cursory view of the vehicle if the trooper were looking for contraband."[27]  "A general grant of permission to search an automobile typically extends to the entire car, absent an objection or an

---

[23]*United States v. Roberts*, 91 Fed. App'x 645, 648 (10th Cir. 2004) (citing *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993)).

[24]*United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003) (citing *Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991)).

[25]*United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 2004) (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

[26]*Marquez*, 337 F.3d at 1208 (quoting *United States v. Ramstad*, 308 F.3d 1139, 1146-47 (10th Cir. 2002)).

[27]*United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005).

explicit limitation by the grantee."[28]  The Tenth Circuit has "consistently and repeatedly . . . held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."[29]

Deputy Rhodd indicated his intent to search for drugs before receiving defendant's consent.  He asked for consent to search immediately after questioning defendant about whether his truck contained drugs.  Although Deputy Trammel ran a drug dog around the vehicle before defendant was asked to move it to a more convenient location, a reasonable person would have expected more than this cursory inspection of the vehicle in the knowledge that the deputies were searching for contraband.[30]  Furthermore, defendant did not object when Deputy Rhodd asked him to move his car away from the gas pump.  In fact, defendant actively facilitated the search by doing so.

As to drilling the hole, the consent form signed by defendant explicitly consented to "removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband."  Deputies Rhodd and Trammel suspected a constructed compartment existed underneath the Toyota's truck

---

[28]*Rosborough*, 366 F.3d at 1150 (citing *United States v. Deases*, 918 F.2d 118, 122 (10th Cir. 1990)).

[29]*United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) (citing *United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir.1998); *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996); *United States v. McRae*, 81 F.3d 1528, 1538 (10th Cir. 1996); *United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995); *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994)).

[30]Defendant suggests that because a canine alert to a vehicle establishes probable cause that contraband is present, the converse is true absent evidence to the contrary.  Not only does defendant cite no law to support this proposition, but this argument fails on its own merits.  Even if probable cause were dispelled, the consent in addition to reasonable suspicion, and not probable cause, justified the investigatory detention.  A drug dog may not be able to detect drugs where, as here, the smell of drugs is masked by their concealment in a sophisticated hidden compartment sprinkled with cayenne pepper, and packaging in plastic boxes smothered in axle grease and wrapped with several layers of cellophane.  As already discussed, the Court finds that there were plenty of facts to support the deputies' continued reasonable suspicion that there was contraband in the truck.

bed.  Deputy Trammel noticed heavy underspray, which is often used to disguise welds and other

indications that a hidden compartment has been created.  Deputy Trammel also noticed freshly

tooled bolts, suggesting that the bed had been removed recently, but that the bed on the truck

was not new.  The deputies had two methods of access to the compartment by which to see

whether it contained contraband; removal of the entire truck bed, or drilling a small hole.

Drilling the hole was obviously the least intrusive, and was therefore within the scope of

defendant's consent.  Furthermore, defendant stood idly by while the deputies searched his truck

and drilled the hole.  Defendant's failure to limit the scope of the search, or object at any time,

further indicates to the Court that the search was at all times within the scope of defendant's

consent.

Ultimately, the deputies could have drilled a hole in the pick-up bed whether or not it was

within the scope of defendant's consent.  "Evidence of a hidden compartment can contribute to a

finding of probable cause to search.[31]  "Whether probable cause to search a vehicle can be based

on evidence of a hidden compartment depends on two factors: (1) the probative value of the

evidence—that is, the likelihood that there really is a hidden compartment; and (2) the likelihood

that a vehicle with a hidden compartment would, in the circumstances, be secreting

contraband."[32]  The first factor is met here because, as noted above, Deputy Trammel found

---

[31]*United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir. 1997) (citing *United States v. Inocencio*, 40 F.3d 716, 724 (5th Cir. 1994) (holding that evidence of hidden compartment contributed to probable cause to search); *United States v. Nicholson*, 17 F.3d 1294, 1298 (10th Cir. 1994) (same); *United States v. Martel-Martines*, 988 F.2d 855, 858-59 (8th Cir. 1993) (same); *United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990) (holding that evidence of hidden compartment, along with inadequate amount of luggage for claimed duration of trip, furnished probable cause); *United States v. Price*, 869 F.2d 801, 804 (5th Cir. 1989) ("Once the agents had discovered the secret compartment they had probable cause to search the compartment itself.")).

[32]*United States v. Ledesma*, 447 F.3d 1307, 1317 (10th Cir. 2006) (citing *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1236 (10th Cir. 2004)).

evidence of a hidden compartment in the bed of the pick-up, and other suspicious circumstances concerning defendant's travel plans and demeanor.  The second factor is "not a concern because if [a] vehicle ha[s] a hidden compartment, it [is] highly likely to contain contraband."[33]  Indeed, it is "hard to conceive of a legitimate use for a large hidden storage compartment in any vehicle."[34]  Therefore, the officers had probable cause to search the vehicle once they found evidence of the hidden compartment, and could have drilled even had defendant objected.

Finally, defendant contends that his contact with the deputies was no longer consensual after the deputies asked him move his vehicle downtown without probable cause.  Assuming defendant did not voluntarily consent to driving to police headquarters, "[l]aw enforcement personnel may arrest a person without a warrant if there is probable cause to believe that person committed a crime."[35]  Probable cause exists for a warrantless arrest if, at the time of the arrest, "the facts and circumstances within the officer's knowledge and of which the officer had reasonably trustworthy information were sufficient to warrant a prudent officer in believing the defendant had committed or was committing a crime."[36]  "Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer."[37]

By the time the deputies asked defendant to follow them to police headquarters, the facts

---

[33]*Id.*

[34]*Id.*

[35]*Gordon*, 173 F.3d at 766 (10th Cir. 1999) (citing *United States v. Wright*, 932 F.2d 868, 877 (10th Cir. 1991)).

[36]*Id.* (citing *United States v. Snow*, 82 F.3d 935, 942 (10th Cir. 1996)).

[37]*Id.* (citing *Snow*, 82 F.3d at 942) (quotation and further citations omitted).

and circumstances known to them were sufficient to warrant a prudent, cautious, trained police officer's belief that the Toyota contained contraband. The deputies were aware of a three-to-four inch deep hidden compartment in the bed of defendant's truck. Also, the deputies observed cellophane, which is commonly used to package drugs and conceal their smell. Therefore, even if defendant did not voluntarily consent to driving to police headquarters, the deputies had probable cause to arrest him.

### C. Inculpatory Statements

Presuming a constitutional violation occurred at some point before drugs were found in defendant's vehicle, defendant asks this Court to suppress inculpatory statements he made during the custodial interrogation subsequent to his arrest as fruit of the poisonous tree. "In order to prevail on a motion to suppress evidence as derivative evidence, a defendant must establish both illegal police activity and some nexus between the illegal police activity and the evidence obtained."[38] "In order to show such a factual nexus, at a minimum, [defendant] must adduce evidence . . . showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[39]

Defendant's contention that he would not have made inculpatory statements but for the officer's request that he come to law enforcement headquarters is specious at best. Deputies Rhodd and Trammel asked the defendant to drive to the station and defendant agreed. Therefore, it appears to the Court that defendant voluntarily consented to the search of his Toyota pick-up at police headquarters.

---

[38]*United States v. Roberts*, 91 Fed. App'x 645, 648 (10th Cir. 2004) (citing *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001); *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)).

[39]*Id.* (citing *United States v. Deluca*, 269 F.3d at 1132).

However, even if defendant did not consent to driving to police headquarters, defendant's motion to suppress would fail because his presence at the station was not the result of any unconstitutional conduct by the deputies.  As discussed above, Deputy Rhodd needed no suspicion to justify approaching defendant, asking some questions, and requesting identification.  By the time Deputy Rhodd asked for consent to search defendant's vehicle, he had a reasonable suspicion that defendant was trafficking contraband.  Defendant consented to a search of his vehicle, and did not limit his consent or object at any time to the search.  During the course of the search, the deputies found evidence of a hidden compartment.  Upon further inspection, the deputies confirmed the existence of a hidden compartment, which contained some movable object and cellophane.  At that point, the deputies had probable cause to arrest defendant.  They then asked defendant to come to police headquarters, where they discovered fourteen packages of methamphetamine and arrested defendant.  Because the government did not engage in unconstitutional conduct before defendant made inculpatory statements, defendant cannot meet the minimum showing of a factual nexus between illegal police activity and his inculpatory statements.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion to suppress (Doc. 7) is **DENIED**.

**IT IS SO ORDERED**

Dated this 31st day of July 2006.                   S/ Julie A. Robinson

                                                    Julie A. Robinson
                                                    United States District Judge